William E. RUSSELL, Executor of the Estate of Lillian L. Russell, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 64 C 1376.

United States District Court
N. D. Illinois, E. D.

Aug. 5, 1966.

Maurice James Moriarty, Chicago, Ill., Robert O. Rogers, West Palm Beach, Fla., for plaintiff.

Edward V. Hanrahan, U. S. Atty., Chicago, Ill., Edward J. Snyder, Washington, D. C., for defendant.

## MEMORANDUM OF DECISION

JULIUS J. HOFFMAN, District Judge.

This action is brought by the plaintiff, William E. Russell, in his capacity as the executor of the estate of Lillian L. Russell, his mother. Jurisdiction over the subject matter of the suit is created by 28 U.S.C. § 1346(a) (1), the complaint being one against the United States for the recovery of a tax erroneously collected under the internal revenue laws, in that it was allegedly in excess of the amount properly due.

The cause was tried to the court without a jury, and pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, this memorandum of decision will constitute the court's findings of fact and conclusions of law.

It appears from the evidence that the decedent, Lillian L. Russell, died on January 9, 1960. The plaintiff, who is the duly qualified executor of her estate, filed an estate tax return for the decedent's estate on April 10, 1961, reporting the taxable estate as $236,545.43, and asserting the federal estate tax due as $58,146.54 which amount was paid on the date the return was filed.

On March 14, 1963, the plaintiff filed an amended estate tax return, reporting the taxable estate as $76,084.33 and computing the estate tax due as $14,003.61. If that figure is determined to be correct, the conclusion would be that there had been an overpayment of $44,142.93. A claim was filed with the District Director of Internal Revenue at Chicago for a refund of this amount on April 23, 1966. This claim was disallowed, and after an audit of the estate, the District Director increased the value of the taxable estate above that reported on the original return and assessed additional taxes in the sum of $48,778.61. This amount was paid by the plaintiff on December 31, 1963. On December 30, 1963, the plaintiff filed an amended claim for a refund, seeking the sum of $92,802.21, which is the amount sought to be recovered in this suit. This sum is the aggregate of the original refund claimed plus the amount paid pursuant to the deficiency assessment. On April 27, 1964, the plaintiff paid an additional assessment of $8,044.00 representing the interest due on the deficiency assessment paid on December 31, 1963. On April 27, 1964, the plaintiff filed a further amended claim for refund to include this interest payment, increasing the claim to $100,542.99. This claim was disallowed on July 1, 1964.

The rejection by the District Director of the plaintiff's claimed deductions or exclusions from the gross estate and the concomitant disallowance of the claims for refund constitute the basis of this action.

## A. CLAIMS AGAINST THE ESTATE BY PATRICK AND MARY RUSSELL

The first issue to be dealt with is the allegation that Patrick Russell and Mary St. Marie, children of the decedent and brother and sister of the plaintiff, had valid claims against the decedent's estate which should have been allowed as deductions from the gross estate, and which were improperly denied as such by the District Director of Internal Revenue.

William E. Russell Senior, the father of the plaintiff died on March 3, 1948.

Under the terms of his will, he bequeathed to his wife Lillian (the decedent whose estate is here involved) certain assets to be held by her, not as an individual, but as trustee for the benefit of Patrick and Mary, until they attained their majority. The particular trust assets here relevant consisted of 2,569.8 shares of the capital stock of the Peerless Packing Co., bequeathed by the elder Russell to be held in trust for the benefit of Patrick, and a like number to be so held for Mary.

These shares were distributed to Lillian Russell, along with Peerless shares distributed to her as an individual and along with certain other trust assets which need not be detailed here. Following the death of the senior Russell, and up to December 28, 1950, dividends were paid on the Peerless shares held in trust by Lillian in the following sums: $1,890.00 in dividends on those shares of Peerless held in trust for Patrick, and $4,770.00 on those held for Mary. On December 28, 1950, the Peerless shares held by Lillian for Patrick were sold for $64,250.00 as were those held for Mary, for a total of $128,500.00.

Patrick reached the age of 21 on July 13, 1954 and Mary attained the same age on November 30, 1957. Lillian Russell did not at either time inform them of the trusts created by their father's will, and neither was aware of the existence of those trusts until after the death of their mother. Prior to her death, Lillian made no distribution to either beneficiary of any part of the sums held in trust for Patrick and Mary.

Letters testamentary were issued in connection with the will of the decedent, Lillian Russell, on January 19, 1960, appointing the plaintiff and the American National Bank & Trust Co. as co-executors. The bank subsequently resigned as an executor. Twenty-three months after the issuance of these letters, Patrick and Mary initiated proceedings in the Probate Court of Cook County, Illinois, seeking the removal from the inventory of the decedent's estate the sums held in trust for them by their mother, at her death. As a result of these proceedings, the Probate Court, on December 7, 1962, awarded to Patrick and Mary the sum of $207,961.00. This figure included the principal plus interest. The parties have stipulated that this figure included $14,778.56 of interest accruing after the death of Lillian Russell, and that this amount is neither excludable nor deductible from the gross estate.

The plaintiff claims that this sum, with the adjustment for the post-death interest, should have been allowed as a deduction under the terms of 26 U.S.C. § 2053(a) (3), which provides:

"\* \* \* the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts \* \* \* (3) for claims against the estate \* \* \* as are allowable by the laws of the jurisdiction \* \* \* under which the estate is being administered."

■ The controversy on this issue concerns the question of whether or not the claims of Patrick and Mary are deductible under this statute. The executor argues that this point has been concluded against the defendant by the decree of the probate court removing $207,961.00 from the decedent's estate as an award to the children. The plaintiff is unquestionably correct in his position that a valid order of a state court conclusively determines property interests as a matter of state law, and that such an order is binding on a federal court for estate tax purposes. I cannot agree, however, that the probate court order under present examination is binding upon this court. The Government has made a successful collateral attack upon that order; it is void and of no effect.

■ The order in question was entered on the joint petition of Patrick and Mary brought under 3 Ill.Ann.Stat. § 187a and, in the alternative, on their separate claims brought under 3 Ill.Ann. Stat. § 202 (5th). The probate court had no jurisdiction to enter the order under § 202. (The parties have proceeded on the assumption that claims

against a decedent's estate are brought "under" § 202, and the court employs that terminology for that reason. However, § 202, while it does designate the classes of claims which may be brought, is not the statute which provides for the filing of claims in the probate court. See 3 Ill.Ann.Stat. § 192.) 3 Ill.Ann. Stat. § 204 creates a nine month's period of limitation on claims against an estate which may be paid from estate assets inventoried within that period. Moreover, § 204 is not of the nature of an ordinary statute of limitations, creating a defense to be raised or lost by the party in whose favor it operates. It is a nonclaim statute, and it operates as a limitation upon the jurisdiction of the probate court. Of course, subject-matter jurisdiction cannot be conferred upon a court by the agreement or defaults of litigants. The section 202 claims made by Patrick and Mary were presented well beyond the nine month period following the issuance of letters to the co-executors, and there were no new after-inventoried assets from which their claims could be satisfied. The probate court, then, was without jurisdiction. It had no power and was not competent to allow the § 202 claims of Patrick and Mary. Austin v. City Bank of Milwaukee, 288 Ill.App. 36, 44–45, 47, 5 N.E. 2d 585 (1936); Pratt v. Baker, 48 Ill. App.2d 442, 446, 199 N.E.2d 307 (1964). Therefore, the relevant order of that court, insofar as it dealt with the § 202 claims, is void.

■ As has been observed, Patrick and Mary also requested the same relief of the probate court in a joint petition under § 187a, and the court's order was alternatively based on that statute. The probate court, however, was also without jurisdiction to grant the requested relief under that statute. As the defendant points out, § 187a was passed to vest jurisdiction in the probate court over the claims of third persons to ownership of property which has been included in the inventory of an estate. Its enactment was prompted by the cases of In re Estate of Quick, 333 Ill.App. 573, 78

N.E.2d 26 (1948) and In re Estate of George, 335 Ill.App. 509, 82 N.E.2d 365 (1948). See 4 James, Ill.Probate Law & Practice § 187a. In *Quick* and *George* it was ruled that the probate courts had no jurisdiction to determine the ownership of personal property in the hands of a personal representative and which was claimed by a third party as his own. The property involved in both *Quick* (50 shares of Blair-Tirrel stock) and *George* (rugs, pictures, jewelry, and the like) was specific and identifiable. That is the sort of property which the Illinois legislature intended the probate courts to deal with under the jurisdiction with which they were invested under § 187a. Here, by contrast, there was no specific, identifiable, earmarked trust *res*. The claims of Patrick and Mary, as allowed by the probate court, would have to be satisfied out of the general assets of the estate.

■ Under § 202, the probate courts of Illinois had jurisdiction over claims similar to those of Patrick and Mary prior to the passage of § 187a. Under Illinois law, if a trustee contravenes the terms of the trust by failing to pay over the trust corpus to the beneficiaries when they reach their majority the trust does not terminate. Crimp v. First Union Trust and Savings Bank, 352 Ill. 93, 185 N.E. 179 (1933) (cited by plaintiff.) Therefore, the decedent, at the time of her death, was the trustee of technical trusts for Patrick and Mary, the funds of the trusts having been commingled with her personal assets. Claims for the recovery of such funds were within the jurisdiction of the probate courts prior to the enactment of § 187a as claims of the fifth class in the statute which was the predecessor of § 202. And the claims of these children constituted claims of the fifth class under § 202, and as such were barred by the nonclaim provisions of § 204. It cannot be said that the legislature intended to allow claimants to escape the nonclaim statute by bringing § 202 claims as § 187a claims. The statutes do not overlap. The claims which had been includ-

ed within the predecessor to § 202 do not also come within § 187a. § 187a was designed to add to the scope of probate court jurisdiction, not to duplicate that which it had. The Probate Court of Cook County had no jurisdiction, under either § 202 or § 187a, to allow the claims of Patrick and Mary, and the order therefore is void and is not binding on this court.

■ The question remains whether the claims of Patrick and Mary are deductible under the terms of 26 U.S.C. § 2053. My decision, thus far, states only that the issue has not been conclusively determined as a matter of state law by the action of the Probate Court of Cook County. That does not resolve the ultimate issue. The claims of Patrick and Mary were not enforceable under state law at the time they were filed with the probate court. This fact makes necessary an interpretation of the language of § 2053 providing for deductions from the gross estate of such claims against the estate "as are allowable by the laws of the jurisdiction * * * under which the estate is being administered." The persuasive weight of the case law is to the effect that this language must be read to refer to such claims "as are allowable [at the time of the decedent's death] under the laws of the jurisdiction where the estate is being administered." Commissioner of Int. Rev. v. Strauss, 77 F.2d 401 (7th Cir. 1935); Smyth v. Erickson, 221 F.2d 1, (9th Cir. 1955); Winer v. United States, 153 F.Supp. 941 (S.D.N.Y.1957). See also Ithaca Trust Co. v. United States, 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647 (1929). In that case, involving another statute, the Supreme Court, in an opinion by Justice Holmes, held that an estate tax is a tax on the act of the decedent and not on the receipt of property by legatees, and that the estate transferred must be valued at the date of death. Justice Holmes wrote:

"The question is whether the amount of the diminution, that is, the length of the postponement, is to be determined by the event as it turned out, * * * or * * * as they stood on the day when the testator died. * * * The estate so far as may be is settled as of the day of the testator's death."

The Court there made a pronouncement about the nature of an estate tax, and it held that the estate must be considered as settled as of the date of the decedent's death, and not as effected by subsequent events; that is, the taxpayer cannot be compelled to pay taxes on amounts which fall into an estate by reason of events subsequent to the date of death.

The relevant inquiry, therefore, is whether the claims of Patrick and Mary were allowable in the State of Illinois on January 9, 1960, the date of the death of Lillian Russell. That the claims were subsequently lost by lapse of time is irrelevant.

It is significant to note that *Strauss*, *Winer*, and *Erickson* dealt with statutes which were the predecessors of § 2053. The latter two cases indicate that the earlier statute used the words "claims as are allowed by the jurisdiction." This language was changed in the 1954 revision to "claims as are allowable," which brings the language of the statute into line with the case law as it had developed in the cases to which I have referred.

Consideration has also been given to Revenue Ruling 60–247, relied on by the Government. If controlling, it might compel a different decision on this point. The word "might" is used because that ruling bars deductions for claims against an estate which have not been paid or will not be paid because the creditor (1) waives payment, (2) fails to file his claim within the time limit and under the conditions prescribed by applicable local law, or (3) otherwise fails to enforce payment. Its applicability here is questionable because we assume that the probate court's order was obeyed and that the claims of these children were paid.

■ In any event, this revenue ruling is not controlling because of applicable case law. A revenue ruling which runs counter to the provisions of a statute is a legal nullity. United States v. Eddy Brothers, Inc., 291 F.2d 529, 531 (8th Cir. 1961); Tandy Leather Co. v. United States, 232 F.Supp. 641, 649 and 347 F.2d 693 (5th Cir. 1965), citing United States v. Bennett, 186 F.2d 407 (5th Cir. 1951). The statute says only what the cases interpret it to say, and the statute, through the cases, is directly opposed to Revenue Ruling 60–247.

■ It must now be determined whether the children, Patrick and Mary, had claims against the estate, allowable at the time of the decedent's death, for trust funds held for their benefit by Lillian Russell. In Illinois, the law is that the *cestuis que trustent* do have a claim against an estate for trust funds held and commingled by the decedent. Crimp, supra; Velde v. Reardon, 322 Ill.App. 177, 54 N.E.2d 91 (1944) (abstract of case); Edgerton v. Johnson, 178 F.2d 106 (7th Cir. 1949). If this were not true, there would be no need for the provision in § 202, as a claim of the 5th class, for claims for "money and property received or held in trust by decedent which cannot be identified or traced." See Adams Exp. Co. v. Oglesby, 215 Ill. App. 94 (1919), which apparently was codified by § 202.

It is clear from the evidence that the decedent, at her death, held as trustee for Patrick under the will of the senior William Russell, the sum of $66,245.00, plus interest due to that date; and that she similarly held for the benefit of Mary, the sum of $69,015.00, plus interest due at that date. The Government contends that the evidence proved that a partial accounting of trust assets was had by both Mary and Patrick. These sums, being one of $7,956.54 had by Mary and one of $10,317.70 had by Patrick, the Government urges should not be deducted from the gross estate. The court does not agree with this position.

■ With respect to the sum received by Mary and allegedly chargeable to her as a partial trust accounting, Government group exhibit B contains a copy of savings account no. 4336 of the Evergreen Plaza Bank. It is identified as "Lillian L. Russell, trustee for Mary Russell." The account was opened on September 19, 1959 with a deposit of $8,-500.00 from the decedent's personal funds. On September 22, 1959, the decedent made a deposit of $8,341.03. This was the closing balance from an account in another bank which was also identified as a trust account for Mary. Because it came from that account, the Government argues that this sum is traceable to earmarked trust assets. It should be noted that when the Government was arguing the invalidity of the probate court order under § 187a, it urged that the other account held commingled funds, that is, non-specific non-identifiable funds. Nevertheless, the traceability of this sum is not material. It is clear that as of the moment of deposit into the Evergreen account, this sum was commingled with the personal assets of Lillian Russell. The course of her treatment of this account, as reflected by Government exhibit B, demonstrated that she regarded this as a fund constituted out of her personal assets and subject to her control unfettered by the fiduciary obligations she bore as a result of her husband's will. Moreover, she eventually reduced the balance from a high of $16,800.00 to a figure less than the amount which was traceable to the earlier trust account. After the death of Lilliam Russell, this account was closed by Mary. She withdrew the balance, which consisted of a deposit of $57,600.00 which was not a trust asset, and of the sum allegedly received by Mary as a partial trust accounting.

The evidence regarding this account demonstrates that the deposits made into it by Lillian Russell were not made as deposits of earmarked funds pursuant to the trust created by the will of her late husband. The sum in question was re-

ceived from this account by Mary as a gift from her mother, see e. g., In re Estate of Petralia, 32 Ill.2d 134, 204 N.E.2d 1 (1965), and of her mother's personal assets, and it may not be charged to her as an accounting of sums due under the testamentary trust created by her father.

 The court's finding on this issue is, of course, bolstered by the law of Illinois as set forth in Crimp v. First Union Trust and Savings Bank, 352 Ill. 93, 185 N.E. 179 (1933). See 2 Scott, Trusts § 172 (2d ed. 1956). The rule under that case is that when a trustee has mingled trust assets with his own, as occurred in the account under examination, and if there is a question whether distributions from the trustee to the beneficiary represented a trust accounting or some other form of distribution, any doubts are to be resolved against the trustee and in favor of the beneficiary.

 The same reasoning applies with regard to the sums allegedly received as a partial accounting by Patrick. On April 25, 1958, the decedent opened joint account no. 2263 at the Evergreen Bank, in her name and in the name of Patrick. This was not designated as a trust account, and although the initial deposit may have been traceable to trust assets, it was not a deposit of trust assets. It became a personal asset of Lillian Russell, subject to the claims of her creditors. Moreover, the evidence clearly shows that the decedent intended that Patrick have the funds in that account as a gift from her. (Tr. pp. 540–541.) That Lillian was also a trustee of funds for Patrick does not mean that every transfer of money from her to him must necessarily have been a trust accounting, or that Patrick may be so charged. This is also true of Mary's situation. Merely because sums received by beneficiaries emanate from persons who are trustees for their benefit, the *cestuis* are not disqualified from receiving them as anything but trust accountings. See *Crimp*, supra. The funds had by Patrick from

the Evergreen Bank were taken by him as gifts from his mother and out of her personal assets, and these sums are not chargeable to him as partial accountings of amounts due under the testamentary trust created by his father.

B. WILLIAM RUSSELL'S CLAIM THAT DECEDENT TRANSFERRED TO HIM, INTER VIVOS, THE BENEFICIAL INTEREST IN A LAND TRUST

Lillian Russell was the owner of a beneficial interest in Chicago Title and Trust Co. land trust no. 34869. The trust *res* was the real property situated at 10549 South Artesian Street in Chicago, Illinois. The plaintiff, William Russell, executor, asserts that shortly before her unexpected demise, his mother assigned to him and his wife, Elizabeth, her interest in the land trust, and that its value may not, therefore, be included in her gross estate. The Government insists that no assignment was made, and that even if it were, it was done in contemplation of death and that the value of the interest is therefore includable in the gross estate.

 For approximately ten years prior to the death of Lillian, William and his family had occupied one floor of the apartment building situated at the Artesian Street address, and Lillian had occupied the other. In his proof with respect to this issue, the plaintiff introduced a certified copy of his petition to the probate court (plaintiff's exhibit 6) requesting, in paragraph 12, the withdrawal from the inventory of the decedent's estate of the beneficial interest in the land trust now in question. Plaintiff's exhibit 7 is a certified copy of that court's order allowing the relief requested. He urges [see plaintiff's post trial memorandum pp. 40–41.] that this order by the probate court is a binding determination for estate tax purposes, and is conclusive in this court on the issue of whether an inter vivos transfer of the interest in the land trust was effected. If the order is valid, it is binding, as the plaintiff insists. Sharp v. Commis-

sioner, 303 U.S. 624, 58 S.Ct. 748, 82 L.Ed. 1087 (1938), reversing 91 F.2d 802 (3d Cir. 1937) and the court concludes that the order is valid. When plaintiff's exhibit 7 was offered into evidence, the court refused to accept it as evidence of the plaintiff's ownership of this beneficial interest, but instead as evidence that the order was in fact entered. The order, if valid, is not evidence which the court might weigh together with other proof in considering whether or not the transfer alleged did or did not occur. Rather, if the order was validly issued, it is a conclusive and binding determination on that issue. It is a decision by the probate court that, as a matter of Illinois law, the transfer of the beneficial interest in the land trust did occur before the decedent's death, and that she had no interest therein at her death.

■■ The probate court did have jurisdiction to enter this order. Government's group exhibit J (tr. pp. 507–510) includes the trust agreement which created the beneficial interest in question. The terms of that agreement create the sort of beneficial interest which, under the law of Illinois, constitutes personalty, Horney v. Hayes, 11 Ill.2d 178, 183, 142 N.E.2d 94 (1957), rather than realty. 2 Scott, Trusts § 130.1 (2 ed. 1956). Further, this beneficial interest was specific and identifiable personal property, and not something indistinguishable from general estate property. Therefore, the probate court had jurisdiction under 3 Ill.Ann. Stat. § 187a to enter an order permitting the withdrawal of this asset from the inventory of the estate. Although this order was rendered pursuant to a petition which was not filed until August 3, 1962, § 187a is not governed by the nonclaim provisions of § 204.

There is nothing in the evidence which indicates that the order of the probate court was the result of a nonadversary or collusive proceeding. The evidence adduced on the issue of adversity shows clearly that the probate proceedings dealing with the decedent's estate were contested. (E. g., see tr. pp. 59, 69, 74, 92, 93, 96, 99, 101–103, 117, 142, 168–170.) The Government pleaded collusion, by which is meant "lack of contest." It did not, however, introduce any evidence in an attempt to prove that the relevant hearing was collusive. Moreover, the order shown in plaintiff's exhibit 7 illustrates on its face that it is the product of an adversary proceeding. The probate judge, Judge Cooney, states in the preamble to his order that Patrick and Mary were present in court and represented by counsel, and that witnesses had been heard for and against the petition. That alone reveals that there was a contest over the claim of William. Further, the opposition of Patrick and Mary to his petition is clear from the fact that if William succeeded in having the beneficial interest withdrawn from the estate, they would, as residuary legatees in Lillian's will, lose their respective one-third interests in this asset valued at the sum of $41,000.00. The court finds, therefore, that the probate court's order was the result of an adversary, contested proceeding. Further, the order was necessarily based upon that court's conclusions of both fact and law, for in order that the judge decide that the transfer had occurred, he had to determine the facts in respect to the transaction and then to decide that, as a matter of Illinois law, these facts operated as a transfer of the interest.

The order is binding upon this court as a conclusive finding that, as a matter of Illinois law, Lillian Russell made an inter vivos transfer of her interest in the land trust to William and Elizabeth Russell, and that she therefore had no interest therein at her death. See, e. g., Helvering v. Rhodes' Estate, 117 F.2d 509 (8th Cir. 1941). The evidence compels a finding in accordance with that of the probate court. The testimony of the witness Enright, corroborating that of other "interested" parties, was that he, being an attorney, prepared an assignment of the interest in the land trust pursuant to the directions of the decedent, and that he later saw it, signed by the decedent and the donees. (Tr. pp. 135–137) The

testimony of Enright established the donative intent of the decedent with regard to the transfer of her interest in the land trust. Further, the testimony of William Russell also established this donative intent. (Tr. p. 163). William's testimony also clearly established that his mother gave him the document containing the terms of assignment, which has now been lost. (Tr. pp. 163–164). (All of the evidence compels the finding that the transfer was absolute and unconditional, however.) The delivery of this document to William constituted the element of delivery, or symbolic delivery, required to make a gift of personalty and this interest was personalty. That the document was delivered to William is supported by Enright's testimony that it was William who brought it to his office after all persons concerned had executed it. (Tr. p. 136). All of this evidence is further corroborated by the testimony of Elizabeth Russell. (Tr. pp. 297–298, 304, 306). There is additional circumstantial evidence which supports the finding that the transfer occurred as described. Elizabeth Russell testified that, after the transfer occurred, the decedent made a payment of rent to William on the building which constituted the trust *res,* indicating that she had given up interest therein, and it is clear that William made a payment on the mortgage covering the building. (Tr. p. 167; plaintiff's exhibit 5). Although this payment was in fact made after the decedent's death, the face of the payment check reveals that the funds came from the personal account of William and Elizabeth, rather than from the estate assets, indicating the belief by them that the interest in this personalty had been transferred to them by the decedent while she lived.

The court concludes, therefore, from all of the relevant evidence, that the decedent made an inter vivos transfer of her interest in the land trust in question, and that she had no interest therein at her death, and reiterates its conclusion that the probate court order is binding here on this issue.

There remains the question of whether the transfer of the interest was made in contemplation of death, as alleged by the Government. 26 U.S.C. § 2035(b) creates a rebuttable presumption that transfers made within three years of the date of death were made in contemplation of death. Mrs. Russell was approximately 62 years old at the time of her death, and the transfer in question had occurred only some eight days prior thereto.

 Both parties have cited United States v. Wells, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867 (1931) as a controlling authority on this issue. Chief Justice Hughes there wrote for the Court:

> "Yet age in itself cannot be regarded as furnishing a decisive test, for sound health and purposes associated with life, rather than death, may motivate the transfer. The words "in contemplation of death" mean that the thought of death is the impelling cause of the transfer * * *"

> "If it is the thought of death, as a controlling motive prompting the disposition of property, that affords the test, it follows that the statute does not embrace gifts inter vivos which spring from a different motive." 283 U.S. at 118, 51 S.Ct. at 452.

The testimony clearly shows that the decedent made the transfer to induce William to remain as a resident in the building, her motive being to keep her only grandchildren close at hand. (Tr. 161, 296). And by causing William to remain in that building, she prevented his taking the step of buying a home, which the decedent desired to do because she felt that William could not afford to assume that responsibility. (Tr. pp. 133–134). The dominant motive prompting the transfer was that of insuring that her grandchildren, whose presence was a source of happiness to her, would remain as tenants of the building in which she resided. It was a motive associated with life, and not even remotely with death. The transfer was not effected as a step toward putting her worldly affairs in order; it has not the slightest flavor of

a testamentary disposition; it was not done with an eye to avoiding death taxes. Further, the testimony demonstrates that the decedent was an active person in the period shortly preceding her death (Tr. 297, 309–310). She was in good mental and physical health. (Tr. pp. 150, 157, 171, 306). And the Government offered no evidence to the contrary.

■ The court concludes that the transfer of the beneficial interest in the land trust was not made in contemplation of death. Therefore, the value of that interest, which the parties stipulate to be $41,000.00, should not have been included in the gross estate. It was further stipulated, however, that the value of this asset, and therefore of the deduction, should be diminished by the amount of $12,823.95, which represents the amount due on a mortgage at the time of the transfer.

### C. THE VALUE OF SHARES OF RUSSELL PACKING CO. STOCK

■ The court must now consider the issue of the value of the capital stock of the Russell Packing Co. as of January 9, 1960. The evidence offered by the parties with respect to this issue came from the testimony of one expert witness for each party.

The plaintiff urges that the value of this stock is $1,360.00 per share. The District Director of Internal Revenue has rejected this figure when reported in the estate tax return. To sustain his proof that the stock was worth a sum not in excess of $1,360.00, the plaintiff offered as an expert witness, Mr. Earl Meyer. The stock involved is that of a closely held corporation. The shares are unlisted and have no ready market. As provided by 26 U.S.C. § 2031(b), and amplified by the governing regulations, Mr. Meyer reached his determination of the fair market value of these shares by comparing the value of the stock of what he deemed to be reasonably comparable corporations, the shares of which were traded. The flaw which made his testimony incredible was the identity of the corporations he selected for purposes of this comparison. He chose none other than the giants of the meat packing industry, including Swift & Co., Armour & Co., John Morrell, Wilson & Co., Rath Packing Co., and George A. Hormel & Co. (Tr. p. 204). He asserted that in order to compensate for the colossal difference between Russell and these companies that he selected the various ratios used in his analysis by choosing those least favorable to the several companies, a procedure which favored the plaintiff's position. (Tr. 240). Certainly no meaningful comparison between the companies chosen by Mr. Meyer for this purpose could be or was drawn. The witness virtually admitted on the stand that the comparison was not meaningful. (See Tr. pp. 205, 243–244). He considered this to be a "best available estimate" rather than a valid estimate.

His use of the largest companies in the industry make the underlying premise of his computations unacceptable, and his testimony unconvincing as to the value of the Russell stock. I cite only as an example his decision to take no account of Russell's good will (which the Government expert found to be "negative" good will), in the face of the direction of Regulation 20.2031–2(f) (2) that it should be considered. The witness was obviously unfamiliar with the guideposts for stock evaluation established by the Code and its Regulations.

The Government expert, Groh, gave credible and persuasive testimony. He used several methods of valuing the Russell stock, the crucial one being his comparison of Russell with two other small packers having traded shares and which were companies reasonably comparable to Russell. His conclusion, as a result of this particular comparison, and not as a result of averaging the results of his various approaches, was that the Russell stock had a fair market value of $2,100.00 per share. (Tr. p. 458). His other approaches did, however, yield figures which supported his conclusion on the fair market value of $2,100.00. (Tr. p. 464).

Groh did, as a matter of law, examine what were the relevant factors in forming his opinion on the market value of the shares. The relevant regulation, § 20.2031–2(f) and a pertinent Revenue Ruling (Rev.Rul. 59–60) are set out together in 4 Rabkin & Johnson, Federal Estate & Gift Taxation § 52.11(7), and it is clear that the considerations there enumerated were relied upon by Mr. Groh. (E. g., Tr. pp. 381–385).

The court concludes that the fair market value of the stock of the Russell Packing Co. was, on January 9, 1960, $2,100.00 per share. The plaintiff was not and is not entitled to a tax refund based upon his evaluation of the stock as being worth only $1,360.00 per share.

## D. MISCELLANEOUS ISSUES

The pleadings raised an issue with regard to the value of 200 shares of stock of the Chicago Rivet and Machine Co. The parties have stipulated that the value of that stock, as of January 9, 1960, was $5,550.00, and the court, therefore, finds that to be the value of those shares.

The parties have also stipulated that there is to be a deduction from the gross estate for the legal expenses incurred by the plaintiff in prosecuting this action. The plaintiff is entitled to such a deduction under 26 U.S.C. § 2053; see Regulation § 20.2053–3(c) (2). The parties have stipulated that a proposed fee is to be submitted for approval to the Internal Revenue Service. If it is disapproved and no accord can be reached, the fee is to by determined by the court.

I direct that the parties prepare a judgment order in keeping with the views herein expressed. The parties have agreed that the Internal Revenue Service is to have the initial right to compute the judgment figure. I assume, however, that there will be no irreconcilable disagreement on that point, and that the parties will reach an accord on what that figure should be. I do not intend to compute it for you, but I will allow you adequate time to complete your computations.