ESTATE OF CLARENCE McDOWELL, DECEASED, PEGGY NYSTROM, PERSONAL REPRESENTATIVE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of McDowell v. Commissioner
Docket No. 27520-83.
United States Tax Court
T.C. Memo 1986-27; 1986 Tax Ct. Memo LEXIS 583; 51 T.C.M. (CCH) 319; T.C.M. (RIA) 86027; January 22, 1986. David N. Niklas, for the petitioner. Joel Lopata, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined a deficiency of $21,098.21 in petitioner's Federal estate taxes. After concessions, the issues for decision are (1) whether an annuity obligation, in excess of payments actually made, represented a claim against the estate deductible under section 2053(a)(3); [1] and (2) if the claim is deductible, whether the amount deductible should be determined actuarially. *585 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. Petitioner is the Estate of Clarence McDowell ("the decedent") who died testate on February 26, 1980. The decedent was domiciled near Chester, Montana, at the time of his death, and his estate was probated in the Twelfth Judicial District of the State of Montana in and for the County of Liberty. Peggy Nystrom ("Peggy"), the decedent's daughter, was nominated and qualified as the decedent's personal representative under his will. The sole beneficiaries under the will were Peggy and her brother Lance McDowell ("Lance"). Petitioner was solvent. The decedent was a rancher who spent most of his life on a family ranch 31 miles north of Chester, Montana. Both Peggy and Lance were raised at the ranch, and Lance continued to reside and work at the ranch as an adult. Alister Murray ("Alister") lived two or three miles from the decedent and his family and had a close relationship with them. Alister was single and had no relatives in the United States. He led a quiet life with few social contacts. Prior *586 to 1976, Alister owned a ranch and was engaged in ranching operations. In 1976 Alister was injured as a result of an accident and decided to retire from ranching. Eventually, Alister entered into an annuity agreement with the decedent and Lance which provided for the sale of his ranch and other property to the decedent and Lance in consideration for their promise "to pay * * * his expenses for an agreeable room monthly at the Liberty County Nursing Home, Chester, Montana, during [Alister's] lifetime" or if Alister did not reside at the Liberty County Nursing Home to "pay directly to [Alister] each month a sum equal to the expenses for such an agreeable room at the Liberty County Nursing Home." Such payments were to be made monthly. In addition, the decedent and Lance promised to pay other stipulated expenses up to $100.00 per month. The agreement also provided that the decedent and Lance would provide Alister accommodations at the decedent's ranch at Alister's request. The decedent and Lance were jointly and severally liable on the contract. The decedent had a 50 percent interest in the contract, and 50 percent of the value of the property received was included in the decendent's *587 estate. Alister did move to Liberty County Nursing Home and resided there until his death on June 27, 1980, at the age of 74. Initially, Alister resided in a minimal care facility which was affiliated with the nursing home. However, by 1979 his health had deteriorated, and he was moved to the nursing home on May 25, 1979. In May of 1979 Dr. Richard S. Buker, Alister's attending physician, became concerned about the deterioration of Alister's health. Dr. Buker suspected that Alister had an artery block, which resulted in a series of small strokes. This condition could have been corrected by surgery. In order to confirm this diagnosis, Dr. Buker had Alister examined at Great Falls Hospital which had more sophisticated diagnostic facilities than those available at Liberty County Hospital. The consultants at Great Falls Hospital recommended against surgery because of the magnitude of other medical problems they identified which they felt would result in Alister's death within a year. Dr. Buker did not agree with the prognosis or diagnosis made by the consultants at Great Falls Hospital. The autopsy performed by Dr. Buker showed that their diagnosis was incorrect. In the period *588 succeeding his examination at Great Falls Hospital, Alister experienced significant and severe deterioration in his health. Although he did not accept the diagnosis or prognosis made by the consultants at Great Falls Hospital, Dr. Buker felt that Alister had a life-threatening problem and that his outlook for the future was poor. As confirmed by the autopsy, Alister's primary problem was the artery block. This condition could have been corrected by surgery up to the week in which Alister died.Without the corrective surgery, Alister continued to experience strokes which resulted in various physical problems which he had during the last year of his life. As a result of these problems, Alister died of asphyxiation which is the usual cause of death for individuals with this condition. The decedent predeceased Alister by approximately four months. The decedent's will provided, in part: VI. I have previously hereto purchased the Alister Murray Ranch with my son, Lance Ray McDowell. * * * I further direct that my devisees herein continue my obligations to Alister Murray until the death of Alister Murray. [Emphasis added.] Lance had visited Alister on the day of the decedent's *589 funeral and had promised to continue the annuity agreement. Lance acted as agent to the personal representative during the probate proceedings, and Peggy, the personal representative, concurred in his statement to Alister. Petitioner did, in fact, continue to make payments until Alister's death. The total payments made by petitioner during the period between the decedent's death and Alister's death were in the amount of $2,560.25. Peggy published a notice to creditors approximately three to four weeks after the decedent's death. No claim was ever presented by or on behalf of Alister pursuant to Mont. Code Ann., Title 72, ch. 3, part 8 (1974, as amended). However, Peggy believed that the oral commitment made by Lance was sufficient to waive any defenses of limitations which would bar payment of the claim. Peggy filed a Federal estate tax return for petitioner on December 1, 1980. On the Federal estate tax return, the amount of the deduction reported for the annuity obligation to Alister was $37,184.04. The amount was computed by applying the annuity figure from section 20.2031-10(f), Table A(1), Estate Tax Regs., and the adjustment for monthly payments from section 20.2031-10(b)(2), *590 Estate Tax Regs., to the average monthly amount paid pursuant to the annuity agreement in 1980. One-half of this amount was reported as the decedent's obligation. OPINION Petitioner asserts that the amount of $37,184.04, the full actuarial value of one-half of the annuity obligation, is deductible from the value of the gross estate as a claim against the estate under section 2053(a)(3). Respondent maintains that the annuity obligation was not enforceable against the estate except to the extent of payments made in the amount of $2,560.25 and is therefore not deductible under section 2053(a)(3). In the alternative, respondent contends that the annuity obligation should not be valued by the use of the actuarial tables provided in section 20.2031-10(f), Estate Tax Regs. At issue is whether events occuring subsequent to the decedent's death resulted in the annuity obligation becoming unenforceable for Federal estate tax purposes and whether Alister's death was imminent at the date of the decedent's death. Enforceability of the Annuity Obligation
Section 2053(a)(3) provides a deduction *591 from the gross estate for "claims against the estate * * * as are allowable by the laws of the jurisdiction * * * under which the estate is being administered." The legislative history of the statute and its predecessors does not state when the time a claim should be allowable, or allowed under the predecessor statutes, is determined. Section 20.2053-4, Estate Tax Regs., further provides that only those claims "enforceable" against the decedent's estate may be deducted. The regulation does not state when enforceability must be determined. This Court and others have attempted to formulate a rule pertaining to the effect of post-death events on the allowance or enforceability of a claim against the estate. See, e.g., Commissioner v. Shively's Estate,276 F.2d 372 (2d Cir. 1960); Commissioner v. Strauss,77 F.2d 401 (7th Cir. 1935); Jacobs v. Commissioner,34 F.2d 233 (8th Cir. 1929); Estate of Van Horne v. Commissioner,78 T.C. 728 (1982), affd. 720 F.2d 1114 (9th Cir. 1983); Estate of Courtney v. Commissioner,62 T.C. 317 (1974); Estate of Hagmann v. Commissioner,60 T.C. 465 (1973), *592 affd. 492 F.2d 796 (5th Cir. 1974); Russell v. United States,260 F. Supp. 493 (N.D. Ill. 1966); Winer v. United States,153 F. Supp. 941 (S.D.N.Y. 1957). [2] In a recent case we explained the significance of post-death events when considering the enforceablity of a claim. Estate of Van Horne v. Commissioner,supra at 733-734. After analyzing the prior cases in this area, we concluded that "all of the cases in this field dealing with post-death evidence are not easily reconciled with one another, and at times it is like picking one's way through a minefield in seeking to find a completely consistent course of decision in this area." Estate of Van Horne v. Commissioner,supra at 736-737. In Estate of Van Horne v. Commissioner, we explained the seemingly inconsistent positions in our prior cases stating that post-death events should be considered where the claim is "potential, unmatured, contingent, or contested" at the date of death and an examination of subsequent events is necessary to determine *593 whether the claim "actually ripened" into an enforceable claim. Estate of Van Horne v. Commissioner,supra at 733-735. An obligation which becomes void under state law if no claim is filed within a prescribed statutory period was characterized as a potential claim under this analysis. Estate of Van Horne v. Commissioner,supra at 736. *594 Some courts have viewed the test of allowance or enforceability as applying at the date of death and permitted a deduction for an obligation which subsequently becomes unenforceable when the creditor fails to file a claim as required by state law. Commissioner v. Strauss,supra;Russell v. United States,supra;Winer v. United States,supra. In both Strauss and Winer obligations existed at the date of the decedent's death but no claims were presented pursuant to state law nor were the obligations paid. However, the courts in both cases permitted a deduction from the gross estate for the amount of the obligations under the predecessor of section 2053(a)(3). The court in Winer explained that the claim should be allowed irrespective of presentation "[s]ince plaintiff possessed an enforceable claim at the time of the decedent's death." Winer v. United States,supra at 944. The Court of Appeals for the Ninth Circuit to which this case is appealable has cited Strauss and Winer with approval. Propstra v. United States,680 F.2d 1248, 1254 (9th Cir. 1982). The *595 Court of Appeals for the Ninth Circuit has applied the rule in Propstra to actuarially determined legally enforceable claims. Estate of Van Horne v. Commissioner,720 F.2d 1114, 1117 (9th Cir. 1983). Here, petitioner concedes that no claim was presented by or on behalf of Alister pursuant to applicable state law. However, petitioner argues that Alister's failure to file a claim did not render the obligation unenforceable because Peggy and Lance waived the requirement of presentation of the claim and the decedent's testamentary direction to his devisees required that the personal representative discharge the obligation irrespective of presentation of a claim. In the alternative petitioner argues that presentation of a claim would be a futile act and that the Federal estate tax law does not require such a futile act. [3]
Petitioner's first argument requires an examination of the statutory provisions related to creditors' *596 claims against an estate under Mont. Code Ann., Title 72, ch. 3, part 8 (1979). As applicable to this case, the statutory scheme requires that, upon appointment, the personal representative shall publish notice to the creditors once a week for three successive weeks.Mont. Code Ann. sec. 72-3-801 (1979). If proper notice is given, all claims against the estate must be presented within four months after the date of first publication of notice. Mont. Code Ann. sec. 72-3-803(1)(a) (1979). Any claim not presented within the four-month period "if not barred earlier by other statute of limitations [is] barred against the estate, the personal representative, and the heirs and devisees of the decedent." Mont. Code Ann. sec. 72-3-803(1)(1979). The manner in which claims must be presented is prescribed by Mont. Code Ann. section 72-3-804 (1979). If the personal representative disallows a claim which is timely presented in accordance with Mont. Code Ann. sections 803 and 804 (1979) the claimant may commence a proceeding against the personal representative. Mont. Code Ann. sec. 72-3-805 (1979). Presentation *597 is not a requisite to payment of a claim, and the personal representative may pay any just claim which has not been barred with or without formal presentation. Mont. Code Ann. sec. 72-3-808(3) (1979). There is an exception to the statutory bar of Mont. Code Ann. section 72-3-803(1) (1979). Under the statutes the personal representative of a solvent estate, with the consent of all successors, may waive any defense of limitations available to the estate.Mont. Code Ann. sec. 72-3-802 (1979). Successors are defined as "those persons, other than creditors, who are entitled to the property of a decedent under his will or this code." Mont. Code Ann. sec. 72-1-103(42) (1979). The statute does not require any specific form of waiver. In this case Lance visited Alister after the decedent's death and promised that the annuity agreement would be continued. [4] Lance acted as the agent to the personal representative, and she concurred in his promise. The only beneficiaries under the decedent's will were Lance and Peggy who also was appointed as the personal representative. Consequently, all parties *598 required to agree to a waiver of the period of limitations for presentment of a claim had, in effect, consented to an extension of the period for presentment under Mont. Code Ann. section 72-3-803(1) (1979). The estate was solvent, and the parties had the authority to consent to such a waiver. Although it is unlikely that most creditors would rely on an oral waiver, the record clearly indicates that the decedent, Peggy, and Lance had a close personal relationship with Alister. Under these circumstances, we believe that Lance's statements and Peggy's acquiescence were intended to waive the period for presentment of a claim and that they were in fact sufficient to waive the period for presentment under Mont. Code Ann. sec. 72-3-803(1) (1979). The fact that petitioner did continue to make payments pursuant to the annuity obligation supports this conclusion. *599 Although we have determined that Lance's and Peggy's actions were sufficient to waive the statutory period for presentment of a claim under Mont. Code Ann. section 72-3- 803(1) (1979), we cannot agree with petitioner's argument that the requirement of presentment was also waived. The effect of waiver of the period for presentment of Alister's claim would permit the personal representative to continue to make annuity payments after the normal period for presentment of claims prescribed by Mont. Code Ann. section 72-3-803(1) (1979). Mont. Code Ann. sec. 72-3-808(3) (1979). However, the personal representative's decision to make such payments would clearly be discretionary, and Alister would have had to present a claim and commence a proceeding pursuant to Mont. Code Ann. section 72-3-805 (1979) in order to compel payment. When Alister died there was no further opportunity to file a claim for any amounts other than those actually expended up to the time of his death. Petitioner's second argument relates to the direction in the decedent's will that his devisees shall "continue my obligations to Alister Murray until the death of Alister Murray." Petitioner maintains that this direction *600 required the personal representative to discharge the obligation to Alister without presentment of a claim. Some jurisdictions do recognize an exception to the requirement of presentation of a claim by a creditor where there is a specific direction in the decedent's will as to the payment of the decedent's debts. Annot., 65 A.L.R. 861 (1930). These cases involve a direction to the executor or personal representative where the payment of the claim is to be made during the course of the estate administration. We have found no case which permits an exception to the requirement of presentation where the direction was made to the devisees and not the executor or personal representative. As the payment of the claim would be made within the course of administration of the estate where the direction is to the executor or personal representative, just as it would be if the creditor presented a claim, the rule permitting enforcement of such an obligation without presentation of a claim does not unduly affect the underlying policy of the Montana Uniform Probate Code to "promote a speedy and efficient system for liquidating the estate of the decedent and making distribution to *601 its successors." Mont. Code Ann. sec. 72-1-102(2)(c) (1979). However, the situation is different where the direction is to the devisees. There the payment of the obligation, without presentation of a claim, would be made outside the administration of the estate, and in the absence of a clear judicial or statutory mandate, we do not believe that permitting such a claim to be enforceable without presentation promotes the underlying policies of the Montana Uniform Probate Code. Petitioner's final argument is that filing a claim would have been futile in this case and that the Federal estate tax laws do not require such a futile act. In support of this proposition, petitioner cites Rev. Rul. 60-247, 1960-2 C.B. 272. The revenue ruling adopted the analysis of Estate of Feder v. Commissioner,22 T.C. 30 (1954), where the creditor was also the sole beneficiary of the estate and would receive an amount from the estate at least equal to the amount of the obligation. In such an instance, the revenue ruling acknowledged that formal presentation and payment of the claim would be a futile act. Neither the revenue ruling nor Estate of Feder suggested that *602 this exception should be extended beyond the specific factual situation involved in the case, and we can discern no reason to adopt a general exception which would apply where the death of an annuitant terminates the right to further payments. The Court of Appeals for the Ninth Circuit to which appeal would lie in this case has stated that the analysis of Commissioner v. Strauss,supra, and Winer v. United States,supra, is persuasive as to the relevance of post-death events with regard to claims that are certain and enforceable at the time of death. Propstra v. United States,supra at 1254. Both Strauss and Winer permit the allowance of deductions for obligations which are enforceable at the decedent's date of death but are subsequently rendered unenforceable as a result of the creditor's failure to file a claim. Respondent does not dispute and the record clearly shows that the annuity obligation in this case was a valid, enforceable obligation at the date of the decedent's death. Nothing more is required for a deduction under section 2053(a)(3) pursuant to the position adopted by the Court of Appeals for *603 the Ninth Circuit, which stated: We rule that as a matter of law, when claims are for sums certain and are legally enforceable as of the date of death, post-death events are not relevant in computing the permissible deduction. [Propstra v. United States,supra at 1254; Estate of Van Horne v. Commissioner,supra at 1116.] Consequently, we conclude in these circumstances that the value of the annuity obligation, in excess of the payments actually made, was a deductible claim under section 2053(a)(3). Valuation of the Annuity Obligation
Respondent has provided tables for the valuation of annuity obligations in section 20.2031-10(f), Estate Tax Regs.Courts will permit substitution of actual life expectancy for actuarial life expectancy only in exceptional circumstances. Bank of California v. United States,672 F.2d 758, 759-760 (9th Cir. 1982); Continental Ill. Nat. B. & T. of Chicago v. United States,504 F.2d 586, 593 (7th Cir. 1974). The party contending that the actuarial tables are inapplicable bears *604 the burden of proof. Bank of California v. United States,supra at 759. Here, petitioner used the annuity tables in valuing the obligation for purposes of section 2053(a)(3). Respondent maintains that the use of the annuity tables in this instance was erroneous because Alister's death was imminent at the date of the decedent's death. Respondent does not argue that petitioner's computation pursuant to these tables is in error. As respondent seeks to deviate from the use of the annuity tables, he has the burden of proof on this issue. For the reasons discussed below, respondent has not met his burden of proof. Dr. Buker, Alister's attending physician, testified as to Alister's physical condition during the year preceding his death on June 27, 1980. Dr. Buker testified that as early as May of 1979 he felt that Alister's death was imminent. However, dr. Buker explained that it was possible that Alister could have lived as long as two and perhaps as long as three years beyond the date of the decedent's death on February 26, 1980. Alister's primary medical problem was an artery block which could have been corrected by surgery up to the week in which he died. *605 Dr. Buker did not explain why the surgery was not performed. Although specialists at the Great Falls Hospital where Dr. Buker had Alister examined in May of 1979 had recommended that the surgery not be performed as they believed that Alister's life expectancy was less than one year, Dr. Buker did not concur in their diagnosis or prognosis. In fact the autopsy performed by Dr. Buker showed that the diagnosis was incorrect. Respondent submitted no evidence other than the fact of Alister's death approximately four months subsequent to the decedent's death and Dr. Buker's testimony to support his contention that Alister's death was imminent at the date of the decedent's death. While Dr. Buker's testimony clearly shows that Alister was in poor physical condition at the time of the decedent's death, his testimony also indicates that Alister's condition was treatable. The fact that Alister's condition was not treated does not justify a deviation from the annuity tables. Consequently, we find that petitioner properly used the annuity tables to compute the amount of the deduction for the annuity payable to Alister. To reflect the foregoing, Decision will be entered under Rule 155. *606 Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the tax in issue, and all rule references are to the Tax Court Rules of Practice and Procedure. Petitioner argues that the issue of deductibility was not timely raised. An issue is properly raised if the opposing party is given fair notice of the matter in controversy. Markwardt v. Commissioner,64 T.C. 989, 997 (1975). Fair notice requires that the opposing party not be harmed or prejudiced in his ability to prepare for trial. Schuster's Express, Inc. v. Commissioner,66 T.C. 588, 593-594 (1976), affd. without published opinion 562 F.2d 39↩ (2d Cir. 1977). Here, petitioner has not demonstrated that it was harmed or prejudiced in its ability to prepare for trial. In addition, we believe that the language of the notice of deficiency was broad enough to raise both the issue of proper valuation and the issue of deductibility.
2. The effect of post-death events on the allowance or enforceability of a claim has also been the subject of debate among commentators.See, e.g., Zimmerman, Claims Against the Estate: A Continuing Controversy, 10 Est., Gifts & Tr. J. 65 (1985); Note, Current Problems Facing the Executor Taking the Section 2053 Estate Tax Deduction, 30 Vand. L. Rev. 795 (1977); Palmquist, The Estate Tax Deductibility of Unenforced Claims Against a Decedent's Estate, 11 Gonz. L. Rev. 707 (1976); Note, Estate and Income Tax: Claims Against the Estate and Events Subsequent to Date of Death, 22 UCLA L. Rev. 654 (1975); Note, Effect of Events Subsequent to the Decedent's Death on the Valuation of Claims Against His Estate Under Section 2053 of the Federal Estate Tax, 1972 U. Ill. L.F. 770↩ (1972).
3. Petitioner has not argued nor have we considered whether Lance's statements would have estopped the personal representative from denying presentation or whether they constituted a compromise under Mont. Code Ann. sec. 72-3-815↩ (1979).
4. Lance visited Alister after the decedent's death and Alister was able to discuss the annuity obligation and the decedent's death. While Dr. Buker, Alister's physician, suggested that Alister would have been unable to participate in a conversation of the nature described by Lance, we found Lance to be a highly credible witness and believe that any discrepancy between the testimony of Lance and Dr. Buker can be explained by the fact that Alister was one of a number of elderly patients treated by Dr. Buker, suggesting that Dr. Buker's recollection of Alister's condition at any given date might not be completely accurate. We note that the nursing home records introduced into evidence do not conclusively indicate that Alister's mental condition had deteriorated to the extent that he could not conduct a conversation of the nature described by Lance.↩